UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| TERRY TYRONE PULLEN | Case No. 1:14-cv-223 |
| Plaintiff, | Barrett, J. |
| | Bowman, M.J. |
| v. | |
| C.O. MAYNARD, et al, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Plaintiff, an inmate currently incarcerated at the Southern Ohio Correctional Facility (SOCF), brings this civil rights action pursuant to 42 U.S.C. § 1983 against defendants Warden Morgan, Deputy Warden Cool, Unit Manager Nolan, Institutional Inspector Malhman, Captain Bell, and Officers Mainner, Wiget, Butterbaugh, Barney, Distel, Dillow, and John Doe. (Doc. 1). By separate Order, plaintiff has been granted leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. Plaintiff alleges that he was attacked by other another inmates on three different occasions. Plaintiff blames the defendants, all employees at the Southern Ohio Correctional Facility (hereinafter "SOCF"), for the attacks. (*See generally* Doc. 31, Amended Complaint). Plaintiff contends that the defendants violated his constitutional rights by failing to protect him from the attacks.

This civil rights action is now before the Court on Defendants' motion for summary judgment (Doc 99) and the parties' responsive memoranda.  (Docs. 100-103).

I. **Background and Facts**

Plaintiff is an inmate and was incarcerated at SOCF at all times relevant to his complaint. Plaintiff initially filed his civil rights action against twelve (12) different

1

Defendants. (Doc. 4). The court has dismissed Plaintiff's claims against nine of those Defendants sua sponte and permitted his claims against the remaining three Defendants, Officers Distel, Butterbaugh, and Maynard, to proceed. (Doc. 90). Plaintiff's action centers around three separate incidents in which other inmates caused him harm.

    A. *September 2, 2013*

Plaintiff was housed in Cell #24 in the K2 Block at SOCF at all times relevant to his claims on September 2 and 8, 2013. (Doc. 31, Amended Complaint, p. 11, ¶ 1, p. 15, ¶ 2). On September 2, 2013, "Inmate Showes" was walking past Plaintiff's locked cell in order to use the shower at the opposite end of the "KR 21-through-40 range." (Doc. 31, p. 11 ¶ 1). Inmate Showes stopped at Plaintiff's cell and sprayed him with a shampoo bottle containing "human feces, urine and semen." *Id*. Plaintiff alleges that Defendant Correctional Officer Distel "stood back at cell #21 to block out the camera view." *Id*. at ¶ 2. In support of these contentions, Plaintiff has submitted two Declarations by fellow Inmate Robert Perdue. Perdue stated that Officer Distel "stood at my cell while inmate Showes [sprayed] inmate Pullen in cell #24." (Doc. 26, Declaration of Robert Perdue, p. 1). Plaintiff asserts that Officer Distel was only "acting like he was talking to" Perdue. (Exhibit A, *Deposition of Plaintiff*1, p. 137, ¶¶ 12-13, p. 197). Officer Distel does not recall the assault occurring or this conversation with Inmate Perdue. (Exhibit C, *Defendant Distel's Answer to Plaintiff's Interrogatory,* ¶¶ 15, 16, 23).

    B. *September 8, 2013 Incident*

On September 8, 2013, Plaintiff asserts that Inmate Showes was passing his locked cell after using the phone and "sprayed [plaintiff] in the face and eye's [sic] with

2

his bodily fluids" from a sock covered shampoo bottle. (Doc. 31, p. 15, ¶ 2). Inmate Perdue attests that Inmate Showes "pull a shampoo bottle out of pant's walk down to inmate Pullen… *[spray] what smelled as if human [feces and urine.]*" (Doc. 26, p. 2). Plaintiff was lying down in his cell with his head near the back wall when this occurred. (Exhibit A, p. 152, ¶¶ 6-12). The entire incident lasted one to two seconds. (*Id.* at p. 152, ¶¶ 16-25, p. 153 ¶¶ 1-3).

Plaintiff contends that Inmate Showes then started "parading up and down K2 South 21 through 40 range boasting how 'the C/O's will let him do anything he wanted to do to me because I allegedly tried to rape a female officer at CRC!'" (Doc. 64, Plaintiff's Affidavit, p. 4). Plaintiff alleged that Inmate Showes continued this behavior for five minutes. (Doc. 31, p. 15, ¶ 4).

Video surveillance footage from SOCF shows the entire incident. (*See* Exhibit F, SOCF Video). The video shows the inmate using a bottle to spray a substance into a cell over a span of one to two seconds. *Id.* The inmate then immediately walks back approximately one cell distance beyond his own cell and then directly into his cell without changing directions again. *Id.*

Plaintiff admits that he does not recall any correctional officers in nearby proximity at the time of this incident. (Doc. 99, Exhibit A, p. 160, ¶¶ 24-25, p. 161, ¶¶ 1-2). Plaintiff also admits that this area of the prison is very noisy. (*Id.* at p. 160, ¶¶ 4-8). At this time, Plaintiff removed his soiled shirt and placed it in the sink and then cleaned himself. (*Id.* at p. 161, ¶¶ 10-21). Plaintiff claims that Defendant Correctional Officer Butterbaugh passed by his cell at this time. (Doc. 64, p. 4).

Plaintiff asserts that he told Officer Butterbaugh that Inmate Showes "bombed"

3

him out but Officer Butterbaugh ignored him. *Id.* Plaintiff and Inmate Perdue have stated that Officer Butterbaugh walked to Inmate Showes' cell to remove his handcuffs and laughed stating "you got that fucker good." (Doc. 64, p.4; Doc. 26, p.2; Exhibit A, p. 154, ¶¶ 6-9). Plaintiff also admits that he has no reason to believe Officer Butterbaugh had prior knowledge that Inmate Showes was going to spray bodily fluids on him. (*Id.* at p. 162, ¶¶ 11-18). (Plaintiff stated "I mean, I can't say he knew that he was going to do this. I can't say that. Because, like I said, the officers – I didn't see them.") *Id.* Plaintiff alleges no further actions by Defendant Officer Butterbaugh as it relates to this incident. Officer Butterbaugh confirms that he did not have prior knowledge of this incident nor does he presently recall its factual circumstances. (Exhibit D, *Defendant Butterbaugh's Answer to Plaintiff's Interrogatory*, ¶¶ 14, 17, 18).

      Plaintiff was taken to the Ohio State University Hospital approximately four to five hours later. (Doc. 31, p. 15, ¶ 1, p. 17, ¶¶ 10, 12). Plaintiff asserts that this was due to concerns that Inmate Showes may have been infected with Hepatitis B. (Doc. 99, Exhibit A, p. 145, ¶¶ 22-24). Medical personnel found no injuries but provided Plaintiff vaccinations to prevent Hepatitis and HIV. (Doc. 99, Exhibit G, *Medical Records of Terry Pullen*, pp. 10-11; Exhibit G-2, *Certificate of Authenticity of Medical Records*). Plaintiff has been tested for Hepatitis three times, the last of which was in March of 2014, and all results have been negative, which Plaintiff admits. (*Id.* at pp. 1-9; Exhibit A, p. 168, ¶¶ 22-25, p. 169 ¶¶ 1-17). Upon Plaintiff's return from the hospital, he was placed in a different building than Inmate Showes. (Doc. 31, p. 17, ¶ 13.)

*C. Incident of December 1, 2013*

On December 1, 2013, Defendant Correctional Officer Maynard handcuffed Plaintiff's hands and released him from his cell so that he could use the telephone. (Doc. 31, p. 5, ¶ 1). Once handcuffed, Plaintiff and Officer Maynard walked in opposite directions. *Id.* Plaintiff alleges that Inmate Calvin Bell grabbed him from inside his cell as Plaintiff was passing. (Doc. 4, p. 5). Plaintiff claims that Inmate Bell then proceeded to slap, punch, and choke him. *Id.* Plaintiff contends that he called out to Officer Maynard during this altercation. *Id.* In Plaintiff's different filings before this court, he surmises that Officer Maynard was either 14 to 15 cells away or 10 to 12 cells away when Plaintiff called out for help. (Doc. 31, p. 5, ¶ 2, Doc. 4, p.5).

Plaintiff alleges that during this altercation Inmate Bell told him "C/O Maynard had given him the green light to do whatever he wanted…." (Doc. 64, p. 1). Officer Maynard has stated that he did not hear Plaintiff call for help, Plaintiff did not inform him of an assault at that time, and he does not recall an assault occurring. (Doc. 99, Exhibit E, *Defendant Maynard's Answer to Plaintiff's Interrogatory*, ¶¶ 11, 17, 19). Plaintiff alleges that he broke free from Inmate Bell's grasp and proceeded to make a phone call. (Doc. 64, p.1). Plaintiff then claims that Inmate Bell threw urine at him from a Styrofoam cup. *Id.* Plaintiff contends that he then told Officer Maynard about the incident, to which Officer Maynard laughed and made a rude remark before allowing Plaintiff to take a shower to clean off the urine. *Id.* at 2. That evening, Plaintiff told a nurse about the incident who found he looked healthy. (Doc. 4, p. 6).

**II.     Analysis**

**A.  Standard of Review**

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action.  *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.'"  *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989) (quoting *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Satterfield v. Tennessee,* 295 F.3d 611, 615 (6th Cir. 2002); *Little Caesar Enterprises, Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a prima facie case, summary judgment is warranted.  *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*).  A principal purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex,* 477 U.S. at 323-24.  The moving party need not support its motion with evidence disproving the

opposing party's claims. Rather, the moving party need only point out there is an absence of evidence supporting such claims. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996) (citing *Celotex Corp.,* 477 U.S. at 325). Nor must the Court search the entire record for material issues of fact. *Street*, 886 F.2d at 1479-80. The court need only determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. Constitutional Claims

To state a colorable claim under 42 U.S.C. § 1983, a plaintiff must allege (1) a deprivation of rights secured by the Constitution and laws of the United States and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor,* 316 F.3d 584, 590 (6th Cir.2002) (citations omitted). Here, Plaintiff alleges that Defendants violated his Eighth Amendment rights to be free from cruel and unusual punishment by failing to protect him from other inmates.

Although the Constitution does not "mandate comfortable prisons," prison officials "have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (citations and quotation marks omitted). As such, prison officials must take "reasonable measures to guarantee the safety of inmates." *Id.* (citations and quotation marks omitted). *Id.* at 832. However, not every injury suffered by one prisoner at the hands of another translates into

constitutional liability for the prison officials responsible for the victim's safety. *Id.* at 834. In order to succeed on an Eighth Amendment failure to protect claim, Plaintiff must establish both an objective and a subjective component. *See Id.* at 834. The objective component requires Plaintiff to allege a "sufficiently serious" deprivation, i.e. that he was "incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, under the subjective component, a court examines the defendant's state of mind to determine whether he acted with deliberate indifference equivalent to intent to punish inmate health or safety. *Id.*; *see also Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988).

Plaintiff must satisfy the subjective component by demonstrating that (1) the "official knows of and disregards an excessive risk to inmate health or safety" and that (2) the official is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." *Farmer,* 511 U.S. at 837. If an official fails to alleviate a significant risk "that he should have perceived but did not, while no cause for commendation, [this] cannot... be condemned as the infliction of punishment." *Id.* at 838; *see also Amick v. Ohio Dep't of Rehabilitation & Correction*, 521 Fed.Appx. 354, 357-58 (citing *Farmer*). A prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it. *Bishop v. Hackel*, 636 F.3d 757, 767 (6th Cir. 2011) (citing *Farmer* at 841–42).

Plaintiff's claims against each will now be addressed in turn.

1. *Officer Distel*

Plaintiff contends that Officer Distel was aware of, and failed to stop, Inmate's Showes plan to spray Plaintiff with bodily fluids from a shampoo bottle, which resulted in a violation of Plaintiff's Eighth Amendment rights. Plaintiff, however, fails to offer any evidentiary support for his assertion that Defendant Distal violated his constitutional rights. As noted by Defendants, in support of his claims against Officer Distel, Plaintiff has submitted his own complaints and affidavit. These are insufficient to overcome a motion for summary judgment. Notably, affidavits at the summary judgment stage may not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact." *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1283 (6th Cir.1997). Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment. *Wolfe v. Vill. of Brice, Ohio*, 37 F.Supp.2d 1021, 1026 (S.D.Ohio 1999). See *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505; *Copeland*, 57 F.3d at 479.

Plaintiff has also produced two declarations by Inmate Perdue. Perdue stated that Officer Distel "stood at my cell while inmate Showes [sprayed] inmate Pullen in cell #24." (Doc. 26, Declaration of Robert Perdue, p. 1). Perdue's affidavit further states that he heard "inmate Pullen ask [c/o Distal] for the Nurse and some cleaning supply's [sic] and c/o Distal told him to shut the fuck up.[1]" (*Id*).

As noted by Defendants, Perdue's declaration addressing the September 2, 2013 incident only supports the claim that Officer Distel was three cells away speaking to Perdue when Inmate Showes sprayed Plaintiff with bodily fluids. (*See* Doc. 26, p. 1). Such evidence, fails to show that Defendant Distel (1) knew of and disregards an

---

[1] Neither party has submitted any video footage of this incident.

excessive risk to inmate health or safety" and that (2) he is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference."

Notably, the law requires that prison officials must "take *reasonable measures* to guarantee the safety of inmates in their custody." *Brennan,* 511 U.S. at 832-33 (emphasis added). Not every single attack, no matter how repugnant, gives rise to a constitutional claim for deliberate indifference. In this regard, several courts have found that a human waste attack, without an allegation of approval by prison officials or a failure to clean, was insufficient to create an Eighth Amendment violation. *See, e.g., Sterling v. Smith,* 2007 WL 781274, *4 (S.D.Ga.2007). *See Zimmerman v. Seyfert,* No. 9:03-CV-1389 (TJM), 2007 WL 2080517, *29 (N.D.N.Y. July 19, 2007) (no Eighth Amendment violation where officer delayed letting plaintiff shower for approximately one-half hour after feces and urine had been thrown on him by another inmate); *Hayes v. Waite,* No. 2:06-cv-101-FtM-29DNF, 2007 WL 2827730, *7 (M.D.Fla. Sept.27, 2007) (no Eighth Amendment violation where other inmates created the unsanitary conditions by throwing feces and urine and where there was no allegation that Defendants failed to clean up after such incidents); *Sterling v. Smith,* No. CV606-103, 2007 WL 781274, *4 (S.D.Ga. Mar.8, 2007) (no Eighth Amendment violation where there was no allegation that "prison officials condone such behavior [throwing fecal matter] or force [inmates] to remain in filthy conditions" an where plaintiff did not "allege that prison officials allow[ed] an unsanitary condition to persist by failing to clean the prison or refusing to provide him with cleaning supplies"); *Snyder v. McGinnis,* No. 03-CV-0902E, 2004 WL 1949472, *9-10 (W.D.N.Y. Sept.2, 2004) (no Eighth Amendment violation where prison officials

10

moved inmate next to plaintiff despite knowledge that they were enemies because risk that feces would be thrown at inmate did not rise to level necessary to sustain claim); *McNatt v. Unit Manager Parker,* No. 3:99CV1397 AHN, 2000 WL 307000, *4 (D.Conn. Jan.18, 2000) (where plaintiff deprived of toilet paper and cleaning supplies for one day, the court held that although the conditions were not pleasant, "the brief duration of the deprivation causes the court to conclude that the conditions did not constitute an Eighth Amendment violation").

Here, there is no credible allegation that Defendant Distal condoned inmate Showes' actions, and there is no allegation that the Plaintiff was unable to clean himself and/or the area was not cleaned afterwards. To the contrary, Plaintiff admits that a correctional officer escorting an inmate to the shower does not always walk in close proximity to the inmate and they are sometimes required to stop to speak to other inmates. (Doc. 99, Exhibit A, at p. 150, ¶¶ 6-12.) Plaintiff also admits that he has no basis for his belief that Officer Distel had prior knowledge that Inmate Showes was going to spray bodily fluids on him. (*Id.* at p. 151, ¶¶ 1-8). (Plaintiff stated "this is only a belief. A belief is like, you know, close to nothing. I can't say I know… I kind of believe that he knew it was about to happen… ."). *Id.* Plaintiff stated that he had access to soap and water and was able to clean himself after. (*Id.* at p. 143, ¶¶ 16-23). Later, Plaintiff consulted a nurse about the incident. *Id.*

In light of the foregoing, the undersigned finds that Plaintiff has failed to establish a claim for deliberate indifference under the Eighth Amendment against Defendant Distal.

*2. Officer Butterbaugh*

As detailed above, Inmate Showes sprayed Plaintiff with feces a second time on September 8, 2013. (Doc. 99, Exhibit A, p. 160, ¶¶ 24-25, p. 161, ¶¶ 1-2). After the incident, Plaintiff claims that inmate Showes marched up and down K2 South 21 through 40 range boasting how 'the C/O's will let him do anything he wanted to do to me because I allegedly tried to rape a female officer at CRC!'" (Doc. 64, Plaintiff's Affidavit, p. 4). Plaintiff claims that Defendant Butterbaugh knew of the risk of the attack and failed to prevent it. Again, Plaintiff fails to provide any evidence to substantiate this assertion.

In support of this claim, Plaintiff has submitted the affidavit of Robert Perdue, an inmate who allegedly "observed" inmate Showes spray Plaintiff with feces and urine. (Doc. 26). Perdue's affidavit further states that inmate Showes walked up and down the range boasting that the C/O's in K-2 let him do what he wanted to Pullen. Perdue further claims that he heard Officer Butterbaugh tell inmate Showes that "he got that fucker good." *Id.*

Video surveillance footage from SOCF, however, shows the entire incident. (*See* Doc. 99, Exhibit F, SOCF Video). The video shows the inmate using a bottle to spray a substance into a cell over a span of one to two seconds. *Id.* The inmate then immediately walks back approximately one cell distance beyond his own cell and then directly into his cell without changing directions again. *Id.*

Plaintiff also admits that he does not know whether Officer Butterbaugh had prior awareness of this risk. (Doc. 99, Ex. A. at p. 162, ¶¶ 11-18) ("I mean, I can't say he knew that he was going to do this. I can't say that. Because, like I said, the officers – I

12

didn't see them."). Moreover, Perdue's declaration addressing the September 8, 2013 incident only supports the claim that Plaintiff was sprayed by Inmate Showes and that he walked up and down the range boasting that the officers had acquiesced to his behavior (which is contradicted by the video surveillance) (Doc. 26, p.2).  There is no evidence that Officer Butterbaugh was aware of a substantial risk of serious harm to Plaintiff and/or that he acted with deliberate indifference to that risk of harm.  *See Farmer,* 511 U.S. at 837. In other words, there is no evidence that Officer Butterbaugh knew that inmate Showes planned to spray Plaintiff with feces and/or failed to prevent such an attack.  Accordingly, Officer Butterbaugh is entitled to judgment as a matter of law with respect to these claims.

    3. Officer Maynard

Last, Plaintiff claims that Officer Maynard failed to protect him when he was allegedly grabbed and punched by Inmate Bell in December 2013. (Doc. 31, p. 5, ¶3; Doc. 4, p. 5). Notably, Plaintiff alleges that while he was being assaulted by inmate Bell, he called out for help to Officer Maynard, Notably, there is no evidence that Officer Maynard heard Plaintiff's alleged plea for help.

Plaintiff admits that Officer Maynard was a distance of 10 to 15 cells away in a noisy prison block. (Compare Doc. 31, p. 5, ¶ 2 with Doc. 4, p.5; Exhibit A, p. 160, ¶¶ 4-8). Officer Maynard has stated that he did not hear Plaintiff's alleged call for help. (Exhibit E, ¶¶ 11, 17, 19).  Furthermore, Plaintiff's own account indicates that "C/O Maynard never looked by to my call for help" (Doc. 31, p. 5, ¶ 2); "[Officer Maynard] kept walking until he was off the range…." (Doc. 4, p.5).

Officer Maynard can only be liable if he actually heard Plaintiff's alleged call for help, acknowledged a risk of serious harm, and then deliberately ignored that risk. *Bishop*, 636 F.3d at 767 (*citing* Farmer at 841–42). Plaintiff has put for forth no evidence and/or argument establishing such actions.  Therefore, Officer Maynard cannot be liable to Plaintiff's section 1983 action under the Eighth Amendment.

### III.     Qualified Immunity

Although the undersigned finds that Plaintiff has not established a violation of his constitutional rights, Defendants are also entitled to the defense of qualified immunity. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity not only insulates government officials from individual liability for money damages, but from the burdens and expenses of litigation and trial. *Saucier v. Katz,* 533 U.S. 194, 200–201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The doctrine of qualified immunity is intended to balance the following competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986) (internal quotations omitted)). Qualified immunity applies regardless of whether the

14

official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson,* 555 U.S. at 231.

Once a defendant raises a qualified immunity defense, the plaintiff must satisfy a two pronged analysis: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right, and (2) if a violation could be made out on a favorable view of the parties' submission, was the right clearly established at the time of the injury? *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In its discretion, the court may initially address either of these questions in light of the circumstances of the particular case before it in resolving an officer's qualified immunity claim. *Pearson,* 555 U.S. at 236–37. Plaintiff bears the burden of showing that a right is clearly established. *Everson v. Leis,* 556 F.3d 484, 494 (6th Cir.2009). Defendant, however, bears the burden of showing that the challenged actions were objectively reasonable in light of the law existing at the time. *Id.*

Here, Plaintiff has produced no evidence that Defendants violated his constitutional rights. Therefore, Defendants are entitled to qualified immunity.

### IV. Conclusion

For these reasons, the undersigned finds that Defendant is entitled to judgment as a matter of law and it is therefore **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 99) be **GRANTED**, all other pending motions be **DENIED as MOOT** (Docs. 94, 106, 107, 108, 109, 110); and this matter be **TERMINATED** on the active docket of the Court.

    *s/Stephanie K. Bowman*
Stephanie K. Bowman

United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| TERRY TYRONE PULLEN | Case No. 1:14-cv-223 |
| Plaintiff, | Barrett, J. |
| v. | Bowman, M.J. |
| C.O. MAYNARD, et al, | |
| Defendants. | |

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).